THE CELTIC MONARCH.

THE SEA LION.

(Circuit Court of Appeals, Ninth Circuit. June 5, 1905.)

No. 1,143.

ADMIRALTY—PLEADING—MOTION TO VACATE ATTACHMENT.

Under admiralty rule 51, which provides that new facts alleged in an answer shall be considered as denied by the libelant without replication, the truth of such allegations cannot be assumed for the purposes of a summary motion on the pleadings to vacate the attachment of a vessel for "manifest want of equity," filed pursuant to admiralty rule 35 of the District Court of the District of Washington, and such a motion cannot properly be sustained where the libel states a cause of action against the libeled vessel.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Piles, Donworth & Howe and C. H. Farrell, for appellant.

James M. Ashton, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. In the evening of October 27, 1904, the steamship Mainlander, owned by the appellant, and of the alleged value of $100,000, was run into and sunk in the waters of Puget

Sound by the steamtug Sea Lion, having in tow the sailing ship Celtic Monarch. The next day—October 28th—the appellant commenced the present suit in the court below against both the tug and tow. October 28th the Celtic Monarch, and October 29th the Sea Lion, were attached by the United States marshal pursuant to the terms of a monition issued to him out of, and under the seal of, the District Court; but both vessels were subsequently released from custody on receipt by the marshal of a notice of the bonding of each of them, signed by the clerk of the court. On November 2, 1904, a mandate was issued by the court below, directed to the libelant, requiring it to appear before the court the next day at 2 o'clock p. m., and show cause why the attachment of the Celtic Monarch and her cargo should not be vacated. This mandate was not served upon the proctors for the libelant until 9:30 a. m. of November 3, 1904. On the same day—November 3d—an amended libel was filed, as also an answer thereto by the claimant of the Celtic Monarch, supported by two affidavits; and on these pleadings the cause was heard at the appointed time, resulting in a decree dismissing the case as to the Celtic Monarch, with costs, from which decree the present appeal is brought.

These summary proceedings were had and taken by virtue of an admiralty rule of the court below, numbered 35, which is as follows:

"(35) In case of the attachment of property or arrest of the person in causes of civil and admiralty jurisdiction (except in suits for seamen's wages, when the attachment is issued upon certificate pursuant to Act of Congress of July 20, 1790 [1 Stat. 131]), the party arrested, or any person having a right to intervene in respect to the thing attached, may, upon evidence showing any improper practices or a manifest want of equity on the part of the libelant, have a mandate from the judge for the libelant to show cause instanter why the arrest or attachment should not be vacated."

The rule is a good one, and enables the court to make speedy disposition of causes where improper practice or a manifest want of equity is shown on the part of the libelant. But let us see whether either of these things may justly be affirmed of the libelant in the present case.

Turning to the amended libel, we find the libelant's cause of suit thus stated:

"That at the times hereinafter mentioned the steamtug Sea Lion was engaged in the business of towing vessels on the waters of Puget Sound to the Pacific Ocean, and her master was C. C. Manter. On the 27th day of October, 1904, the Sea Lion took in tow the British ship Celtic Monarch at or near Tacoma. On board the Celtic Monarch were her master, officers, and crew. The towline by which the Sea Lion towed the Celtic Monarch was an insufficient and improper towline to be used in the then condition of the weather, and the Sea Lion was not seaworthy at the time she took the Celtic Monarch in tow, for the weather which then existed and which was to be reasonably anticipated on the voyage from Tacoma to the ocean. At the time the Celtic Monarch was taken in tow, her master and officers consented to the use of the improper towline, and consented to being towed by the Sea Lion in her then unseaworthy condition. For several days prior to the day of the collision hereinafter mentioned, thick fogs had daily arisen, which increased in density as night came on. When the Celtic Monarch was taken in tow, a fog prevailed, which as evening approached became thicker, and the

master of the tug and master of the Celtic Monarch had reason to know that as night approached it was probable that the fog would become more dense. Notwithstanding said facts, the towline by which the Sea Lion towed the Celtic Monarch was of such a length that the master of the Sea Lion, immediately prior to the collision, did not deem it safe to stop or back the Sea Lion, because of the danger of the Celtic Monarch running into the Sea Lion. On the evening of October 27, 1904, between five and six o'clock, the Sea Lion then had the Celtic Monarch in tow; the master, officers, and crew of the Celtic Monarch then being on board of the Celtic Monarch. The Mainlander at said time was bound to Seattle from Bellingham. The last port at which the Mainlander touched prior to the collision hereinafter mentioned was Everett, and the Mainlander was keeping a vigilant lookout and sounding her fog signals, because a fog was then prevailing. As the Mainlander approached West Point light, and was to the north of said point, she heard the fog signal at said point, and as she approached she also heard the fog signals of the tug Sea Lion. The Mainlander continued to sound her fog signals. The fog signals of the Sea Lion were heard on the port bow of the Mainlander. The officer in charge of the Mainlander gave the signal for her to proceed under a slow bell, and said signal was immediately obeyed, and the Mainlander proceeded under a slow bell. The fog signals of the Sea Lion indicated that the vessels were approaching each other, and the officer in charge of the Mainlander signaled to her engineer to stop. Said signal was immediately obeyed, and the Mainlander continued to move through the water, with her engines stopped. Each vessel continued to sound fog signals. A thick fog prevailed. Before the vessels came in sight of each other, the Sea Lion blew two short blasts, and the officer in charge of the Mainlander immediately ordered the engineer of the Mainlander to go full speed astern, which signal was immediately obeyed. The engines of the Mainlander were reversed, and the Mainlander was either just going astern or was just stopped, when the Sea Lion, with the Celtic Monarch in tow, while going at a high rate of speed, with her engines in motion, driving her forward, and with a towline of such length as to make it dangerous, in the opinion of her master, for her to stop or back, struck the Mainlander on her port side, making a large hole in her, and causing her to sink in about twenty minutes from the time she was struck, and barely enabling the passengers and crew of the Mainlander to get aboard the Sea Lion. By reason of the said collision, the Mainlander, with her cargo, tackle, apparel, and furniture, became a total loss. That at the time of said collision the Sea Lion and the Celtic Monarch were out of the customary and usual course taken by vessels going from Tacoma outward bound. They were proceeding at a high and negligent rate of speed in the thick fog. They left Tacoma in a condition of weather making it negligent for a tug and tow of their character to attempt to get to sea. They were negligent in giving passing signals before the Mainlander and the tug and her tow, or either, were in sight of each other. They were negligent in using an improper and insufficient towline. They were negligent in not slowing down when the fog signals of the Mainlander were heard, and in not stopping or endeavoring to stop so that they could locate the Mainlander. They were also negligent in not attempting to make the tug go astern when it was found that they were approaching dangerously near to the Mainlander. They were negligent in not keeping a vigilant lookout for approaching vessels, and, when it was found that they were approaching the Mainlander, the tug and her tow were both so negligently and carelessly handled and steered that they caused said collision, although, if they had been properly handled, and if they had had a proper towline, they could have avoided said collision. The said collision was caused solely by the fault of the said tug and her tow, the Celtic Monarch, and without any fault or negligence on the part of the Mainlander, or any of her officers or crew."

The answer filed by the claimant of the Celtic Monarch admitted that at the time stated in the libel the Sea Lion took the ship Celtic Monarch in tow at or near Tacoma, when the master, officers, and crew of the Celtic Monarch were on board of her, but averred

that the claimant, as well as the master of its ship, was without knowledge as to whether or not the Sea Lion was seaworthy at the time when she took the Celtic Monarch in tow, and further averred that they had no means of acquiring knowledge in respect to the matter. It was further averred that the master and officers of the Celtic Monarch "never consented to the use of an improper towline by said tug at the time when the Celtic Monarch was taken in tow, nor at any other time or at all, but they at no time, nor did the Celtic Monarch at any time, through its master, officers, or owners, consent to being towed by the Sea Lion at a time when the Sea Lion was in an unseaworthy condition, and all allegations in that respect in said amended libel are here denied." The answer further expressly "denies that the towline by which the Sea Lion towed the Celtic Monarch was an insufficient and improper towline to be used in the condition of the weather prevailing at the time of said towing, and here avers that the towline in question was the property of and furnished by the said tug, the Sea Lion, and that, so far as the same could be observed by the master, officers, and crew of the Celtic Monarch, the same was in first-class order and condition, and duly shackled and attached to the Celtic Monarch." In its answer the claimant further expressly "denies that a fog prevailed at the time when the Celtic Monarch was taken in tow, and denies that the master of the Celtic Monarch had reason to know that the fog would probably become more dense as night approached, and denies that the master and officers of said Celtic Monarch had knowledge or had reason to know the condition of said fog at any time, or that it would become more dense at any time." The answer avers "that the scope of hawser between the tug Sea Lion and the tow Celtic Monarch was ample for all purposes, and not of such a length as to endanger their tow or it," and further avers that at the time in question the Celtic Monarch was fully laden with cargo, and that "it would have been impossible for said tug to be running at a high rate of speed when towing such a weight and burden as said ship and her cargo, and for that reason claimants are of the opinion, and here allege, that said tug could not have been running at a very high rate of speed at the time of said collision, and claimant denies that the towline was of such a length as to make it dangerous for the tug to stop, and that claimant is without information as to what was the opinion of the master of the tug in that regard." The answer further expressly "denies that said vessel was proceeding at a high and negligent rate of speed in a thick fog, although they admit that said fog became thick after their departure from Tacoma, as will hereinafter more particularly appear; but claimant denies that the Celtic Monarch left Tacoma in a condition of weather making it negligent for a tug and tow of the character of the Sea Lion and the Celtic Monarch to attempt to go to sea." The answer further expressly "denies that said Celtic Monarch, her officers and crew, were negligent in using an improper and insufficient towline, and denies that they used a towline of any kind, and here avers that the only towline used was that of the tug, and the same was furnished

by the tug, and, so far as the master and officers on board the Celtic Monarch could observe, the same was in proper and sufficient condition. This claimant and respondent here states that the Celtic Monarch kept a vigilant lookout for approaching vessels at all times when in tow of said tug, and that said vessel was handled and steered at all times with great care and caution when in tow of said tug, and properly handled in every way; but claimants here aver that the master, officers, and crew of said Celtic Monarch had no knowledge, nor had they any means of obtaining knowledge, as to any of the other circumstances and conditions set forth and alleged in said fourth article" of the amended libel. The answer further expressly "denies that the collision was caused by the fault of said tow or the Celtic Monarch in any manner or at all, and here avers that it was the speedy, accurate, and proper seamanship of the Celtic Monarch which enabled her to save herself and avoid the destruction of said tug and the lives of the passengers and crew of the steamer Mainlander and said tug at the time of and immediately after said collision." The answer of the claimant further alleges that the Celtic Monarch had never visited the port of Tacoma until the time in question, and her master had never before visited the waters of Puget Sound, and was entirely unfamiliar with them; that, when taken in tow at 1:30 p. m. on October 27th by the Sea Lion in Tacoma Harbor, her master relied solely upon the captain of the Sea Lion to act as his pilot, and relied solely upon the tug and her movements and navigation to safely tow her to sea; that the master, officers, and crew of the Celtic Monarch and her owners were without knowledge as to the seaworthiness and equipment of the Sea Lion, other than her general appearance as she approached the Celtic Monarch for the purpose of taking her in tow, and had no means of judging of her seaworthiness, nor the condition of her towing hawser or other equipment, except in so far as said hawser was passed on board and made fast to the Celtic Monarch, and that all parts of the hawser and of the towing gear furnished by the tug which could be seen by the master and officers of the Celtic Monarch appeared to be in first-class order and condition; that the same did not part nor cause mishap of any kind during the tow from Tacoma to the point of collision, nor did it part at the time of, nor was it instrumental in causing, said collision; that the entire length of the towing hawser, including wire-cable attachment, was, so far as those on board the Celtic Monarch could observe, about 164 fathoms in length from the stern of the tug to the stem of the Celtic Monarch (the hawser being about 180 fathoms in length, 10 fathoms being inboard on the Celtic Monarch, and about 5 or 6 fathoms inboard on the tug); that the jib boom of the Celtic Monarch was 30 feet long, leaving not less than 159 fathoms in the clear between the stern of the tug and the end of the tow's jib boom; that, under these conditions, and the weather being slightly foggy, and the Celtic Monarch relying solely upon the tug, it was taken in tow and continued on its course to sea until nearly opposite Robinson's Point, when the fog became so dense that those on board the vessel were unable to see the tug, but continued to

steer the tow by keeping her directly astern of and in the line of the towing hawser; that a lookout was at all times maintained on the forward part of the forecastle head of the Celtic Monarch, and, in addition to the lookout, her second officer was stationed upon the forecastle head as an additional lookout, and in order that he might be present to transmit orders to the master, and take any precautionary action that might be required in case of accident; that the first officer and crew were all on deck, preparing the vessel for sea; that her master was on the poop deck, astern and alongside of her quartermaster at the helm, directing the quartermaster as to steering the tow, so as to keep her directly astern of the tug, and the full length of the hawser distant from the tug; that the fog horn of the tow was constantly sounded down to and after the collision of the tug; that the tow proceeded as above stated until 5:50 p. m. on the same day, when the second mate reported from the fore-castle head to the captain at the helm that the hawser had carried away, and to starboard the helm, which was instantly done, and, by the master of the vessel starboarding the helm quickly, he was en-abled to direct the movement and momentum of the tow so that she cleared both the tug and the steamer Mainlander, thereby direct-ing her course to port in such a manner and with great skill and seamanship, whereby the tow left the tug and the Mainlander about 20 feet on her starboard side, and continued outward towards the middle of the sound, drifting about in the fog until about 7:30 p. m., when she was again found by the tug, taken in tow, and brought to an anchorage at a point which her master was informed was in Sal-mon Bay; that the Celtic Monarch was in no manner implicated in or connected with the collision, which was solely between the tug and the steamer Mainlander, nor had the master, officers, or crew of the Celtic Monarch any knowledge of the facts and circumstances bringing about said collision at or prior to the happening thereof.

The affidavits filed by the claimant along with its answer were those of the masters of the tug and tow. That of the latter is to the effect that the Celtic Monarch was taken in tow by the tug at Ta-coma at 1:30 p. m. on the 27th of October, 1904, when the weather was hazy, but not sufficiently foggy to prevent the tug and tow from plainly observing each other's movements; that the affiant and his said vessel were entirely under the control of the tug, the ship hav-ing no means of propulsion or control of any kind, except as she was moved by the towing hawser from the tug; that, according to the observation of the affiant, his ship was fully 160 fathoms astern of the tug, and was towed the entire distance from Tacoma to the point of collision at that distance astern; that when his ship arrived off Robinson's Point the fog had become so dense that the tug could not be seen, and remained in that condition until the collision, so that the affiant and those on board the tow had no knowledge as to the facts and circumstances under which the collision occurred; that the affiant could hear the signals which passed between the Mainlander and the tug shortly after the collision, but, aside from that, has no knowledge as to the collision; that the first knowledge that the affiant had of anything unusual was the calling to him by

the second mate, who was standing alongside the vessel's helm, which was being handled by a quartermaster under the direction of the affiant, of "hard astarboard," the vessel taking a course to port and clearing the tug and the Mainlander about 20 feet, they being left at that distance on the starboard side of the Celtic Monarch; that affiant afterwards learned that the call "hard astarboard" had come to the second mate of the vessel through the megaphone from the captain of the tug; that the affiant had no choice as to the time and manner in which his vessel should be taken in tow, all of those matters being entirely in the hands of the tug; that the towing gear was furnished by the tug, and fixed by the tug to the tow, at which time it appeared, with all its shackles and attachments, to be in good order and condition; and that there was no mishap in connection therewith during the towing, the same, and the appliances connected therewith, remaining in good order.

The affidavit of the master of the tug is the same in effect as that of the master of the tow in respect to the taking of the Celtic Monarch in tow, and as to the condition of the weather, and sets out that the Celtic Monarch had no pilot on board, and was navigated solely by the affiant, as master of the tug, with the exception that the ship simply held in position by her helm, so as to follow steadily as a tow following the tug; that the ship had no sail set, nor any means of propulsion other than the tug; that she was towed by a single hawser, the length of which from the stern of the tug to the stem of the tow was at least 160 fathoms, the towing hawser being 180 fathoms in length, and there being not over 10 fathoms inboard on the tow, and not over 5 or 6 fathoms inboard on the tug, and that the length of the hawser from the stern of the tug to the end of the jib boom on the tow was at least 155 fathoms; that the hawser consisted of a new 11-inch manila line, not over 60 days old, in perfect condition, and was safely shackled to the stern towing bitts of the tug, and attached to the tow by means of a 5-inch wire hawser, safely shackled to the manila line about 20 fathoms forward of the vessel's stem; that all the towing gear was strong and in first-class condition, and never parted at any time during the towing nor after the collision; that immediately after the collision, the tug herself being then actually making sternway, affiant ran to the stern of the tug and called through the megaphone to the lookout and master of the tow to put the helm of the tow hard astarboard, and at the same time the affiant immediately cast off the tow hawser from the stern of the tug, which could be done instantly, it being only necessary to pull out of the shackle the pin which held the manila line to the towing bitts; that the tow, with her helm so hard astarboard, and under the momentum caused by the towing, then directed a course to port in such a manner, and with great skill and seamanship, whereby the tow cleared both the tug and the Mainlander, passing over to port of both vessels, leaving them on her starboard side at a distance of about 20 feet at the time when the tow so succeeded in clearing them; that thereafter the affiant, with the tug, immediately saved the lives of all on board the Mainlander, which steamer sank in from 20 to 30 minutes; that, before

the Mainlander sunk, the affiant and his tug tried to save that ship by forcing her onto the beach, but was unable to do so, and thereafter affiant went to find his tow in the fog, and found her about 7:15 p. m. of the same evening, and brought her to anchor about one mile north by east of West Point.

The court below held the case to be such an one as its local rule 35 contemplates, and that it could be "finally disposed of in this summary proceeding, resembling a motion for judgment on the pleadings in an action at law." And in doing so the court further held that "the affirmative matter in the answer must be considered as true, so far as the same is not in conflict with the allegations of the amended libel." But admiralty rule 51, prescribed by the Supreme Court, requires such new facts to be considered as denied by the libelant. That rule is as follows:

"When the defendant in his answer alleges new facts, these shall be considered as denied by the libelant, and no replication, general or special, shall be allowed. But within such time after the answer is filed as shall be fixed by the District Court, either by general rule or by special order, the libelant may amend his libel so as to confess and avoid or explain or add to the new matter set forth in the answer; and within such time as may be fixed in like manner, the defendant shall answer such amendments."

In the event the libelant does not elect to confess and avoid or explain or add to such new matter, but to stand upon the issues raised by the provisions of rule 51, the burden of proof of such matter rests, as a matter of course, upon the party alleging it, and there can be no assumption of its truth without proof.

We can see no possible justification of the decree appealed from, unless it can be held that the amended libel contains no cause of action against the ship Celtic Monarch. But we are further of opinion that it cannot be properly so held, for the reason that the amended libel in effect alleges that the loss of the Mainlander was the result of concurrent negligent acts of the tug and tow, among which are the alleged failure of the Celtic Monarch to maintain a proper lookout, its alleged consent to be towed by an unseaworthy tug with an alleged improper and insufficient towline, and at an alleged excessive and negligent speed, under the conditions existing at the time, in respect to all of which allegations of the amended libel the claimant of the Celtic Monarch took issue by express denials set up in its answer. Upon those issues the libelant was clearly entitled to give evidence, and it is manifest that the merits of the cause could not properly be disposed of in advance of the determination of those issues.

The judgment appealed from is reversed, and the cause remanded to the court below for further proceedings not inconsistent with this opinion.